IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 12, 2011

## LISA MARIE BUTLER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No.  04-00222      John T. Fowlkes, Jr., Judge**

**No. W2010-01232-CCA-R3-PC  - Filed August 15, 2011**

The Petitioner, Lisa Marie Butler, appeals the Shelby County Criminal Court's denial of post-conviction relief from her convictions for first degree felony murder and aggravated child abuse.  On appeal, she contends that trial counsel rendered ineffective assistance by failing to exclude irrelevant evidence of the victim's earlier injuries and that appellate counsel rendered ineffective assistance by failing to argue on appeal that the evidence should have been excluded.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and ROBERT W. WEDEMEYER, JJ., joined.

William Massey and Joseph A. McClusky, Memphis, Tennessee, for the appellant, Lisa Marie Butler.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Garland Erguden, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The Petitioner was sentenced to life imprisonment for the murder conviction and twenty years' confinement for the child abuse conviction, to be served concurrently.  This court affirmed the judgments of the trial court and recited the facts of this case on direct appeal:

Viewed in the light most favorable to the State, the evidence at trial disclosed that in 2003, Dewayne Holloway lived in a two bedroom apartment at 400 South Lauderdale in Shelby County. Holloway's girlfriend, the defendant, lived with him as did two of Holloway's children, [a four-year-old son and an eight-month-old infant son]. The defendant was the infant's mother.

Holloway had full-time employment as an automotive technician at Inside Out Transmission where his work schedule was "basically nine to five." On June 17, 2003, Holloway went to work at 8:00 a.m. and left work at approximately 4:30 p.m. He planned to go home, dress, and then attend the ceremony for his graduation from Tennessee Technology Center, where he had completed automotive technology classes. Holloway testified that the defendant and the infant victim had accompanied him to work that day, and on the way home, Holloway stopped "at a couple of places" looking to purchase film for the defendant's camera because she had agreed to take photographs at Holloway's graduation. Holloway was unable to locate camera film, and because he needed to go home and dress, he declined to stop at any other places. Holloway stated, "And after we couldn't find film, . . . [the defendant] just kind of got upset."

When the group arrived at the apartment, Holloway noticed that his teenage children [. . .] were sitting and waiting on the porch. The defendant went directly into the apartment, leaving the victim in his car seat. Holloway removed the victim from his vehicle, and [his teenage son] carried him into the apartment. Holloway then carried the victim to the upstairs bedroom and placed him in a playpen that also served as the victim's crib. Holloway prepared to take a shower, but first he asked the defendant to clean his shoes. The defendant "basically said no," and Holloway asked his son [. . .] to perform the task. Holloway mentioned to the defendant that the victim's diaper needed to be changed, and the defendant said that she would do so. However, after Holloway showered, he noticed that the defendant had not changed the victim's diaper. Holloway asked the defendant a second time to change the diaper, but the

-2-

defendant did not respond. The defendant did tell Holloway that she would not be attending his graduation, and Holloway and the older children left the apartment at approximately 4:50 p.m. to drive to Mississippi Boulevard Christian Church where the ceremony was being held.

Once at the church, Holloway turned off his cellular telephone as requested by the instructors. The ceremony lasted approximately one hour, and afterwards, Holloway turned on his cellular telephone and discovered that he had received 10 messages from the defendant and a neighbor advising that the victim "had a accident" and was being taken to the hospital. Holloway contacted the defendant who explained that the victim had choked while being fed, that she rushed the victim to the hospital, and that the victim died at the hospital. Holloway drove to the hospital where he encountered the defendant and the defendant's family. Several days later, the defendant admitted to Holloway that she had struck the victim once in the stomach and once in the head because the victim "was hollering and wouldn't shut up."

Holloway related that earlier that same year in April, the victim had sustained a fractured skull and broken wrist. At the time of those injuries, Holloway was incarcerated, and the defendant told him that the injuries were caused when the defendant's 11-year-old sister dropped the infant.

At the time of trial, Holloway and the defendant were engaged to be married. On cross-examination, Holloway characterized the defendant as a "good mother."

Terri Frazier was sitting on her apartment porch visiting with her cousin on June 17, when at approximately 6:00 p.m., the defendant "came around the corner walking, . . . fidgeting with her hands." Frazier had never before met the defendant, but the defendant approached and asked to borrow a telephone. Frazier testified at trial that the defendant explained that she needed a telephone "to call her baby daddy cause her baby wasn't breathing." Frazier handed the defendant a telephone and advised her to first contact E 911. The defendant ignored

the advice, and dialed and redialed a number without success. Frazier described the defendant as unemotional. Frazier's sister grabbed the telephone, dialed E 911, and handed the telephone back to the defendant. The defendant reported to E 911 that the victim had stopped breathing.

In an effort to assist, Frazier's cousin and the cousin's daughter asked the defendant where she lived. The defendant pointed toward the apartment, and the cousin and cousin's daughter ran and tried to get inside the apartment. The doors, however, were locked. Frazier stated that she and the defendant then walked to the apartment, and the defendant unlocked the door. The defendant said that the victim was upstairs, and Frazier and her relatives located the victim in the playpen. Frazier described the victim as "green and his stomach was swollen." Frazier's cousin picked up the victim and placed him on the bed. The woman "blew into his mouth[,] and he threw up a little bit[,] and she wiped the puke out of his mouth, and then she did it again." The paramedics arrived and began treating the victim.

Frazier's cousin, Tonni Burt, testified at trial and corroborated the events of June 17. Burt testified that while she was trying to resuscitate the victim, the defendant merely stood back without emotion. The paramedics were able to establish a heart beat in the victim, and they rushed the child to the ambulance. Burt heard her cousin tell the defendant to go with the paramedics to check on the victim. Burt never saw the defendant crying or displaying emotion.

Memphis Police homicide investigator Nathan Berryman interviewed the defendant on June 20, three days after the victim's death. After acknowledging and waiving her rights, the defendant was questioned at the police department homicide office. Investigator Berryman testified that initially the defendant denied any involvement in the victim's death but ultimately admitted punching the victim in the stomach and head. The defendant told him that she was upset because she did not have camera film to photograph Holloway's graduation. After Holloway left the apartment, the defendant removed the

-4-

victim from the playpen intending to change the diaper, but when the victim began crying, she punched him in the head and stomach, placed him back in the playpen, and went downstairs.

At trial, Investigator Berryman identified a written, four-page statement that recounted the defendant's version of events. Investigator Berryman read the statement to the jury in which the defendant spoke of Holloway harassing her by his repeated requests for her to attend the graduation. The defendant said that Holloway's behavior made her "mad and upset," such that when the victim started crying, she hit the victim and placed him in the playpen face down. The defendant went downstairs and made a sandwich. Later, when she returned to the bedroom, she noticed that the victim was not breathing and had vomit on his face. She removed the victim from the playpen and placed him on the bed. She tried shaking the victim, but he was unresponsive. The defendant moved the victim back to the playpen, and she found her keys and ran out the front door. She asked to borrow a telephone from "some ladies standing [nearby] on the porch." The defendant told the investigator that she placed a call to E 911.

The final part of the statement that Investigator Berryman read to the jury consisted of the following questions and answers:

QUESTION: Where did you hit the baby?

ANSWER: I hit him in the head once and in the stomach.

QUESTION: What part of the head did you hit him in?

ANSWER: The right side.

QUESTION: Did you hit him with anything?

ANSWER: I just hit him with my fist.

QUESTION: Was he lying on his back when you hit him?

ANSWER: Yes.

QUESTION: After you hit the baby while you were lying [sic] him down in the playpen, how was he acting?

ANSWER: He was sniffling.

QUESTION: Did the baby cry or make any other noise while you were downstairs?

ANSWER: No.

QUESTION: Had you ever struck the baby before in this manner?

ANSWER: No.

QUESTION: Have you ever seen Dewayne abuse the baby or any other children?

ANSWER: No.

QUESTION: Do you feel like you've been treated fairly during this interview?

ANSWER: Yes.

QUESTION: Did you give this statement freely and voluntarily without any threats, promises, or coercion?

ANSWER: Yes.

QUESTION: Is there anything else that you would like to add to your statement that would aid us in this investigation?

ANSWER: I'm sorry for what I did to my baby. I should have never hit him.

The State's final witness was Dr. Teresa Campbell who performed the autopsy on the victim. The autopsy revealed

blunt trauma to the victim's head as evidenced by multiple head contusions of various ages and by skull fractures. Doctor Campbell testified that she found one recent skull fracture in the right back of the head and a healing skull fracture on the left side of the head. She also found a "very old skull fracture" on the right side of the head that was almost completely healed. The victim had a "recent left six rib fracture" and a fracture of the arm bone, and Dr. Campbell observed "[s]cattered scars to the chest and the arms and the legs."

Doctor Campbell identified the fatal injury as the blow on the right side of the head and behind the right ear. That injury fractured the skull resulting in brain swelling and difficulties with breathing and heart rate. In her opinion, the fatal fracture was consistent with a "blow with the fist to the back of [the victim's] head." On cross-examination, Dr. Campbell agreed that with a prior brain injury and then a second blow to the head, the brain "is more susceptible to being injured more severely if it's already injured." She also acknowledged the "possibility" that the victim could have survived the recent trauma in the absence of the earlier or older trauma.

State v. Lisa Marie Butler, No. W2005-01964-CCA-R3-CD, Shelby County, slip op. at 1-5 (Tenn. Crim. App. Nov. 7, 2006), app. denied (Tenn. Aug. 13, 2007).

At the post-conviction hearing, the Petitioner testified that she relied upon trial counsel to ensure that only proper evidence was admitted at the trial. She said she did not speak with trial counsel much before or during the trial, but she admitted they discussed the victim's earlier injuries.

On cross-examination, the Petitioner testified that she did not remember trial counsel's visiting her in jail but that she spoke with trial counsel each time she appeared in court. She said her conversations with trial counsel did not last long. She did not remember whether trial counsel gave her copies of her indictment, the evidence obtained during discovery, or a transcript of the preliminary hearing, but she said trial counsel sent her a copy of her confession and a "Motion of Discovery." On questioning from the court, the Petitioner testified that before the trial, she received a large, thick envelope that contained "the Motion of Discovery," her statement to the detectives, and the testimony of witnesses, but that she did not remember how she received the envelope.

Trial counsel testified that he had practiced law for twenty-eight years and that he had worked as a prosecutor and as a public defender. He said he met with the Petitioner "a couple dozen times." He recalled Dr. Campbell, the medical examiner, testifying at the trial that the victim suffered from recent injuries, injuries in the process of healing, and older injuries that had healed. He said that he met with Dr. Campbell before the trial and that she pointed out all of the victim's injuries, using the victim's actual skull and rib cage. He said he attempted to object to Dr. Campbell's testimony regarding the victim's previous injuries, including healing skull and rib fractures and older bruises to the victim's brain, but the objection was overruled. He said he did not mention Tennessee Rule of Evidence 404(b), pertaining to a defendant's other crimes, wrongs, or acts, when objecting and did not remember if there was a jury out hearing on the issue. He did not remember whether the trial court stated the basis for admitting the evidence. He said that he did not file a motion to exclude the evidence of previous injuries pursuant to Rule 404(b) and that there was no pretrial hearing on the issue. He thought the medical examiner had a duty to describe the victim's body as she found it. He agreed the trial court gave a curative instruction to the jury during Dr. Campbell's testimony.

Trial counsel testified that when he cross-examined Dr. Campbell, he attempted to clarify that other people lived in the victim's home who could have been responsible for some of the victim's injuries. He said he met with Mr. Holloway before the trial and learned that the Petitioner's sister previously injured the victim by accidentally dropping him. He said he did not object when Mr. Holloway testified at the trial that the Petitioner's sister previously caused fractures to the victim's skull and rib cage by dropping the victim. Trial counsel said he wanted this testimony to be admitted because it was helpful to establish that persons other than the Petitioner caused some of the victim's injuries. He agreed that Mr. Holloway testified before Dr. Campbell. He said he did not include the Rule 404(b) issue in the motion for a new trial because he thought the trial court's ruling on admitting the evidence was correct.

On cross-examination, trial counsel agreed that Mr. Holloway testified that the Petitioner was a good mother and a loving parent. Trial counsel agreed that the victim was eight months old when he died and six months old when he suffered previous injuries. Trial counsel remembered Dr. Campbell's testifying that the brain injury that caused the victim's death was worsened by previous brain injuries. He agreed that he made a continuing objection to Dr. Campbell's testimony regarding the victim's previous injuries and that he objected to at least ten photographs. He said he had never seen a medical examiner's testimony regarding the condition of a victim's body excluded pursuant to Rule 404(b).

Trial counsel testified that he had an investigator speak with the State's witnesses to determine if the witnesses would tell the investigator the same information they provided to the police. He identified a letter addressed to the Petitioner that stated:

> This will confirm that I have hand-delivered to you this date, in open court, a copy of the Indictment hereinabove referenced, the discovery package regarding same, a transcript of the preliminary hearing and a letter from Dr. Wyatt Nichols. Please review all this material and we will discuss the same on or before your next court date . . . .

Appellate counsel testified that she was an attorney with the Public Defender's Office in Memphis and that she represented the Petitioner on direct appeal. She said she did not raise any issues regarding Rule 404(b) on appeal.

On cross-examination, appellate counsel testified that she had been licensed to practice law in Tennessee since 1993. She said she did not find any Rule 404(b) issues in the Petitioner's case that might have warranted plain error relief.

In denying the petition for post-conviction relief, the trial court found that trial counsel was not ineffective for making a strategic decision not to object to the testimony of Mr. Holloway regarding the victim's previous injuries because trial counsel "reasonably believed" the testimony supported his argument that the victim's death was caused in part by the previous injuries. The trial court found that trial counsel was not ineffective for failing to object on Rule 404(b) grounds when Dr. Campbell testified regarding the victim's previous injuries because the Petitioner failed to show that the outcome of the trial would have been different had trial counsel made the objection. The trial court noted that trial counsel objected to the introduction of photographs and diagrams of the victim on Rule 403 grounds, that Dr. Campbell did not know the source of the victim's injuries, and that Dr. Campbell's testimony supported the overall defense theory that the Petitioner was less culpable because someone other than the Petitioner inflicted injuries that made the victim more susceptible to death. The trial court found that the Petitioner failed to establish that appellate counsel was deficient or that the Petitioner was prejudiced by appellate counsel's tactical decision to focus the appeal on the sufficiency of the evidence, the issue appellate counsel felt was most likely to succeed on direct appeal. This appeal followed.

The burden in a post-conviction proceeding is on the Petitioner to prove her allegations of fact by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006); Dellinger v. State, 279 S.W.3d 282, 294 (Tenn. 2009). Once a petitioner establishes the fact of counsel's errors, the trial court must determine whether those errors resulted in the

ineffective assistance of counsel. Dellinger, 279 S.W.3d at 293; see Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984).

On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456-57 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457. Post-conviction relief may only be given if a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2010).

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland, 466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). A petitioner will only prevail on a claim of ineffective assistance of counsel after satisfying both prongs of the Strickland test. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). The performance prong requires a petitioner raising a claim of ineffectiveness to show that the counsel's representation fell below an objective standard of reasonableness or "outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690. The prejudice prong requires a petitioner to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

In Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975), our supreme court decided that attorneys should be held to the general standard of whether the services rendered were within the range of competence demanded of attorneys in criminal cases. Further, the court stated that the range of competence was to be measured by the duties and criteria set forth in Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974), and United States v. DeCoster, 487 F.2d 1197, 1202-04 (D.C. Cir. 1973). See Baxter, 523 S.W.2d at 936. Also, in reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982); see DeCoster, 487 F.2d at 1201.

The Petitioner contends that trial counsel rendered ineffective assistance by failing to seek exclusion of irrelevant evidence of the victim's previous injuries and that appellate counsel rendered ineffective assistance by failing to argue on appeal that the irrelevant evidence should have been excluded. She argues that the evidence should have been excluded pursuant to Tennessee Rule of Evidence 404(b) and that trial counsel was ineffective because he failed to object to the testimony of Mr. Holloway and failed to object effectively to the testimony of Dr. Campbell and the evidence introduced through her. The State contends that the trial court did not err by denying the petition because trial counsel's strategy to show that previous injuries were partly responsible for the victim's death was reasonable and because the Petitioner did not show she was prejudiced by trial counsel's actions in light of the overwhelming evidence against her. The State has not responded to the argument regarding appellate counsel. We conclude that the trial court did not err by denying the petition for post-conviction relief.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Tennessee Rule of Evidence 404 prohibits evidence of a defendant's other crimes, wrongs, or acts offered to show a character trait in order to prove that the defendant acted in conformity with that character trait. Tenn. R. Evid. 404(b).

Initially, we note that evidence of the victim's previous injuries was relevant. Dr. Campbell testified that the previous injuries made the victim more susceptible to being severely injured by the Petitioner's blows and could have contributed to the victim's death.

With regard to the testimony of Dr. Campbell and the evidence introduced through her, trial counsel testified that although he made a continuing objection to the testimony and at least ten photographs of the victim's previous injuries, he did not cite Rule 404(b) when objecting. We note that Dr. Campbell did not know the source of the victim's injuries and that no evidence established that the Petitioner inflicted the previous injuries. In fact, the evidence showed that the Defendant's sister caused previous injuries. As a result, Dr. Campbell's testimony and the evidence introduced through her were not evidence of the Petitioner's other crimes, wrongs, or acts subject to exclusion under Tennessee Rule of Evidence 404(b). See State v. DuBose, 953 S.W.2d 649, 653 (Tenn. 1997) ("Evidence of crimes, wrongs or acts, if relevant, are not excluded by Rule 404(b) if they were committed by a person other than the accused and are only conditionally excluded if committed by the accused. ").

With regard to trial counsel's decision not to object to Mr. Holloway's testimony that the Petitioner's sister previously dropped the victim, causing a fractured skull and a broken wrist, the Petitioner argues that this was not a tactical decision because trial counsel subsequently objected to Dr. Campbell's testimony regarding previous injuries. We disagree. While Mr. Holloway and Dr. Campbell each testified that the victim suffered from previous injuries, only Mr. Holloway explained the source of the victim's injuries. Trial counsel testified that he did not object because Mr. Holloway's testimony was helpful to establish that persons other than the Petitioner caused injuries to the victim. Although trial counsel sought to limit the Petitioner's culpability and establish that the previous injuries could have contributed to the victim's death, trial counsel did not explain how that could assist the Petitioner in light of her admission that she administered the fatal blow that killed the victim, and this court will not speculate on trial counsel's strategy.

In any event, we agree with the trial court that the Petitioner failed to establish that she was prejudiced by trial counsel's actions. As this court noted on direct appeal:

> The [Petitioner] expressly admitted in her statement given to Investigator Berryman that she knowingly struck the infant because the infant would not cease crying. . . . Furthermore, the evidence is uncontested that the infant was solely in the [Petitioner's] care when the injuries were inflicted and that when Holloway left to attend graduation, the infant was uninjured.
>
> . . .
>
> Dr. Campbell catalogued several injuries of various ages to the infant's head. Doctor Campbell, however, was specific in her testimony that "the injury that killed the child was a blow to the head that caused a fracture to the bone in the head with resulting swelling of the brain. The swelling of the brain would have caused problems with breathing and his heart rate." From the record before us, we note that immediately after Dr. Campbell's statement, the trial court clarified, "For the record, she pointed to the back of the doctor's head on the right side behind the right ear."
>
> . . .

-12-

The defendant, in her statement to Investigator Berryman, identified the location where she struck the infant in the head as "[t]he right side."

Lisa Marie Butler, slip op. at 5-6.

The record reflects that the Petitioner admitted inflicting the blow that caused the victim's death. We conclude that the Petitioner has failed to establish that the outcome of the trial would have been different had trial counsel excluded evidence of the victim's previous injuries. The Petitioner is not entitled to relief.

With regard to appellate counsel, the Petitioner argues that appellate counsel rendered ineffective assistance by failing to argue on appeal that the irrelevant evidence should have been excluded pursuant to Rule 404(b). Appellate counsel testified that she did not find any plain error issues to raise under Rule 404(b) on appeal. As noted above, the evidence of the victim's previous injuries was relevant and was not subject to exclusion under Rule 404(b) because the acts were committed by a person other than the Petitioner. See DuBose, 953 S.W.2d at 653. We agree with the trial court that the Petitioner failed to establish that appellate counsel was deficient or that the Petitioner was prejudiced by appellate counsel's tactical decision to focus the appeal on the sufficiency of the evidence. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON,  PRESIDING JUDGE